Case No. 17-155 et al. Air Alliance Houston et al. Petitioners v. Environmental Protection Agency et al. Mr. Ruhl for the same petitioners. Ms. Duke for Community Petitioners. Ms. Eckert for Petitioner Intervenors. Ms. Ratner for Respondents U.S. EPA et al. Ms. Broome for Intervenor Clinical Safety Applications. Ms. Waller for Intervenor State of Louisiana. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Good morning. Good morning. May it please the Court, Stephen Wu for the State Petitioners. I'd like to reserve two minutes for rebuttal. My argument will focus on the statutory authority issues in this case. Counsel for the Community Petitioners, Emma Chews, will focus on the arbitrary and capricious standard and will share some of her time with Counsel for the Steelworkers, Susan Eckert. We're happy to answer any questions this Court may have on any said issues. All right. So one of the issues is raised by the government and by one of the intervenor briefs is that the type of thing that has been done with the delay rule has been done before. What's your response? It has not been done in precisely this way. And when it has been, this Court has repeatedly held that the agency has acted outside the scope of its statutory authority. What the agency has done here is that – Wait, what case have we held that? Well, there's two cases we rely on principally. One is NRDC versus Riley, and the other is this Court's recent decision in Clean Air Counsel versus Pruitt. And what is critical about both of those cases, and the distinguishing factor for this case as well, is that EPA relied exclusively on its pending agency reconsideration as the basis for a delay in this case. And what Section 307, which is one of the prohibitions here, makes clear, is that when the agency cites a pending reconsideration, its authority is limited to a single three-month delay. And here is a 20-month delay. I want to ask you about Section 307. Section 307 was enacted before 7412R7, right? That's correct. So if you look at Section 307, I'd like you to get the language in front of you. 307, so that's Section 7607D1. It says that this subsection applies to, and then it lists a series of categories from A to B as a victor. And under C, it lists several different types of promulgations, and it has some promulgations under 7412, but not 7412R. So as best as I can see, Section 307D doesn't apply to actions, rulemakings under 7412R at all. Well, I have two responses to that. One is we have a separate argument, which is independent, that 112R7 itself doesn't authorize this delay. Do you agree with what Judge Wilkin's question suggests? We do not. We think that the Section 307 prohibition does apply to 112R7 promulgations, and part of that authority comes from EPA itself. EPA, in both the proposal for this rule and the final delay rule, expressly relied on 307 as a source for its authority. In fact, when it proposed the rule, it didn't even cite it on its own. They did, but maybe they were wrong. Yeah, that's what we're trying to get at. That's correct, but if they are wrong, that is an important basis for saying that 307, if 307 does not even provide the basis for authority under this rule, that removes that basis for the agency's justification. I mean, the only thing that I can see how it would work would be under V, there's a catch-all that says, such other actions as the administrator may determine. That wasn't cited by anybody in the briefing other than, I think, the Chamber of Commerce in their brief, and then you or one of the petitioners came back in reply and said, no, you can't use V, because they were trying to use it as authority for the stay, and you were saying, no, V can't be used. But my point is that you're trying to use D7 to say that the stay can't be longer than three months, but if D1 says that D7 doesn't apply to this case, then your D7 argument is substantially weakened, if not eliminated. That might be right. I mean, I will say I think part of the assumption for many of the parties, because EPA itself relied on 307 as affirmative authority for the rule, that it was then fair to impose a limitation from that section on EPA's authority. And here the plain language of 307D7B is quite clear, as this court recently said in Clean Air Council. It says, well, if the agency points to a pending reconsideration and makes no other affirmative fact findings, that it cannot exceed the three-month delay period that is the only period of delay that that statute offers. I have always thought it's administrative law 101 that an agency can amend a prior rule by notice and comment rulemaking,  therefore connecting those two things. An agency can always amend an effective date or compliance date in a prior rule by using notice and comment rulemaking. And I think Clean Air Council supports that, and I think a lot of cases support that. And to Judge Rogers' question, I think the Obama administration did the same thing on new source review when it came in in 2009. It just seems pretty basic that you can use notice and comment rulemaking to change part of the rule and the effective date or compliance date is part of the rule. Why is that wrong? Well, that might be true in general except for the specific way in which EPA proceeded with the delay here. I mean, if the agency were to rely on general substantive rulemaking authority, it is true. They could use that authority to change things, including the effective date. But 307's prohibition is quite narrow and targeted to what EPA did here, which is the point. But that would mean, I'm sorry to interrupt, but that would mean, I think, that EPA could never change the prior rules, effective date or compliance date, except through 307, which would mean EPA would be in the position of rescinding an entire rule when they may not want to do that, or not changing the effective date or compliance date at all, which may create a lot of problems. Why should they be in that all or nothing box? I think our argument here is quite a bit narrower. The argument here is that when the agency points only to the reconsideration, that's the factor that 307 says the agency cannot do. If it has substantive authority to regulate, if, for instance, they decided to change the underlying substantive rules or they made the factual findings that 112R7 contemplates as the basis for amending the effective date, which they also did not do here, that might be different. But what 307 does not allow is for the agency to use the fact of a reconsideration alone, and that is the only basis cited in the delay rule, as a basis for extending or postponing the effectiveness of the rule. I guess I'm not understanding why that would be the carve out, because they might want to change the effective date or compliance date because they learn that it's going to be too hard to meet, or they might want to change it because, as in this case, they're concerned that some of the premises on which the original rule rested may not be accurate, or they may just have a different view of the policy balance about how to strike that. But those are precisely the circumstances that 307 addresses. I mean, to take a step back, the reconsideration contemplated by 307 arises when somebody raises new facts, not before the agency. You don't need notice and comment from 307, correct? You don't need it. But the reconsideration that comes up is when there's something that comes up before the agency that is of central importance to the outcome of the rule. And even in that circumstance, Congress is very clear that what the agency can do in that period is a 90-day delay. And that is it. And the language in 307 is not limited to administrative stays done without notice and comment. It speaks broadly about the use of the reconsideration at all, and broadly prohibits any action by the agency to delay the rule past the 90-day period. What if the rule is promulgated and it says it's going to go into effect in two years, and then someone says, that's really too long and it should be one year. And the EPA agreed with that and wanted to move the effective date up. Would they have authority to do that? Well, they wouldn't be barred by 307. 307 refers only to the other direction. If you're going to either postpone the effectiveness of a rule or to stay a rule. What authority would they be able to use to move the date up? At that point, I assume they would rely on their substantive authority, and they would not be barred by the separate prohibition in 307. They would rely on 7412R7? Yes. And if it were for the program at issue here, they would rely on 112R7. They would make factual findings that say, for example, that we revisit our conclusion that the industry can comply on this schedule, and we think they can comply faster. So they do have authority under 112R7 to move the date up, but they don't have authority to move it back? Well, they don't have authority, and I want to make this really clear, they don't have authority to move it back simply because somebody has raised factors that trigger a reconsideration. And that is, again, the distinguishing and unique factor here. If you look at the delay rule in this case, what EPA says over and over again is not that they've made any factual findings that support this. Instead, what they quote repeatedly are the arguments that are made by the reconsideration petition and say that EPA needs this 20-month delay so that they can think about those factors and complete the reconsideration process. And that is precisely the narrow circumstance that 307 prohibits. I'm sorry. And they say quite a bit more than that, as you're aware, but I know you're summarizing what they're saying, that they say that they've become aware of potential safety concerns. That's something they stress, that the release of some of this information could actually make it more dangerous, more harmful. Well, I would disagree with that. I mean, EPA got to be very careful. You do, but they're the agency. And on that question, aren't they allowed to say, we were originally going to require this by a certain date. People have raised significant safety concerns that information out there could be used by terrorists or others to cause harm. And we want to make sure before we cause that consequence that we know what we're doing here. But I have two responses to that. Just several things, but that's one that's important. Well, I have two responses to that. One is that the agency actually did not stand behind any of those findings. What it said in its delay rule was it doesn't concede there are any security harms. It does not predict that the conclusion of reconsideration will lead to a fine statement, only to refer to the arguments made by the reconsideration petitioners. And the second point is because all they're doing is pointing to the argument. This might blend in the arbitrary and capricious argument. Just think about good government here. Judges do this too, which is we issue a decision. We're pretty certain about it. And then someone raises something and says, actually, that's that and the other thing, and we might have some more doubts about it. So to an agency. And we want to reconsider that and think about it anew. We're not sure that our original decision was wrong, but we have doubts that we want to explore again and go back. And it would seem like that's just good government for an agency when it's presented with things that might be different from what they'd assumed to think about that. And 307 deals with exactly the situation. What it says the agency can do there is to initiate a reconsideration proceeding. And there's no question here that they can complete that reconsideration on whatever timeline they want. And then they have the authority to impose a 90-day stay, but not more. And Congress was very clear when it put this provision into the statute that it intended this 90-day period to be the time and the limited time that the agency could defer the effectiveness of a rule. But I guess this gets back to the original point. They certainly thought the agency unilaterally was limited to that in that context. But is there any indication that they were saying that you can't use notice and comment rulemaking to change the effective date or compliance date in a rule? Yeah. I mean, there's a couple of indications. One is that the statute doesn't actually say it is limited to actions by the administrator done without notice and comment. It refers generally to actions by the administrator. And I think emphasizing the breadth of that prohibition is that the statute also prohibits courts from issuing stays past the three-month period that's provided there. And so the plainest reading of the statute is that it says that neither the executive nor the courts. On the APA, you have 705 there. That's correct. But APA has not relied on the 705. I'm just saying to your point about courts, 705 arguably is outside the scope of that provision, too. 705 is outside the scope of that provision. EPA did not rely upon it here and did not satisfy the factors that would be needed for a 705 stay. And that only goes to emphasize what they are narrowly allowed to do under the 307 provision. I'd like to very briefly talk about 112R7, which is our separate statutory argument, if I may. 112R7 requires that effective dates under the risk management program be designed to assure compliance with the program's requirements as expeditiously as practicable. And this imposes an independent barrier on what EPA has done here. The delay rule postponed and sets back the effective dates by nearly two years. And it violates 112R7 because it excuses compliance instead of assuring compliance. And it does so on a substantial two-year delay instead of achieving compliance as expeditiously as practicable. So on the word practicable there, that's a classic word of agency discretion. So doesn't this argument really merge with the arbitrary and capricious argument in many respects? In other words, whether it was practical is also, in essence, whether it was reasonable, not arbitrary and capricious to delay it by this much, or am I missing something? No, it does. And to be clear, we do argue that even if you think this is a general reasonableness standard, EPA has violated that. But my argument here – Using practical adds something. Yeah, exactly. My argument here is that 112R7 limits the types of reasons that EPA can rely upon. And we know that both from the text of the statute, what is practicable is what is necessary to achieve compliance with the rule standards. And what EPA relied on here were not findings about what the agency could, what the industry could or could not do, but instead its desire to complete a reconsideration proceeding, which is nowhere in the statute. And we know this also in part because when Congress was considering – effective dates and compliance dates in the original rule, take all the dates in the original rule that were two years later than what were listed in the original rule. Would that original rule have been unlawful? Well, it would have been subject to challenge because the setting of the compliance date in the original rule would have been subject to the requirement that may be done to assure compliance as expeditiously as practicable. And that was one of the debates that the parties had during the notice and comment period for the amendment. And I would say another reason we know that the practicability language is about industry compliance is that EPA itself interpreted it that way in the amendments. They went through many different types of requirements. And for each of these requirements set different compliance deadlines based upon their findings about the steps the industry would need to undertake in order to achieve that on a timely basis. So your argument here, if I understand it, is it needs to be focused solely on – maybe solely is too strong – but whether the regulated entity can meet the deadline. That is correct. And Congress, when it enacted 112R7, focused on those factors as well. In a footnote in our brief, we quote the paragraph in the Senate report where Congress noted, for example, that under this provision, procedural requirements should have quick compliance deadlines so the industry can comply very quickly, while capital improvements, installation of technology and so on might take a little bit longer because those take a much longer lead-up period in order to comply. Thank you. Thank you. All right. Counsel for community petitioners. Good morning. May it please the Court. I'm a judge for community petitioners, and I would appreciate one minute for rebuttal, please. I'd like to address a couple of questions from the Court to add to my colleague's response and then turn to three reasons why delay rule is overturning capricious. First, on Judge Wilkinson's question, in our reply, page 19, we highlight that EPA itself cites additional language that applies 76072 to this rulemaking, and that is 7412R. I think I just left it. It's a provision within 7412R7 that actually makes these 112R – I'm sorry, 7412R7E, which treats 112R rules as 112D standards. JA1649, EPA explains that in its own response to comments. And so there's no doubt in this case that EPA has used that. It's already used up its authority for the three-month delay. And regardless, the clear language and structure of that provision shows an intent of Congress not to allow reconsideration to delay an effective date beyond three months. On Judge Rogers' question, our understanding is this issue has never been decided by this Court, and, of course, past errors by an agency don't justify future ones, as this Court held in the Sarah Club 2008 decision. On the safety concerns question – So it is a past practice, correct? We believe there are a few very limited occasions where EPA has attempted to do this. It's not clear to us that it's ever done it in precisely the same way. The example that interveners cite, we believe they relied on the EPA 705. As this Court highlights, that is a different provision. It doesn't allow a state-pending reconsideration, but it would allow a state-pending review. It does require a task to be met. And there's no evidence here, similar in Mexico, that anyone would suffer irreparable harm from having these rules be in place while EPA performs its reconsideration process. That's really critical, because on the safety concerns point, there's simply speculations that EPA itself already considered and rejected. So this is a very different – But can't they evaluate it differently? And let me frame your – your part of the argument, I think, is let's assume they do have statutory authority. You're arguing it's nonetheless arbitrary and capricious, correct? That's your – On top of the glaring statutory violation. Yes, I understand. But for your part of the argument, assume the argument that it has statutory authority, it's nonetheless arbitrary and capricious. And I just want to frame it that way for your part of the argument. It seems to me that the agency – or a new agency, a new administration can come in and say, well, we're – we evaluate those concerns differently. We assess policy differently. We have cases – Chief Judge Garland's case in National Association of Homebuilders says it's perfectly appropriate for a new administration to come in and evaluate costs and benefits differently to take a fresh look at policy. And so why can't that happen? That's not what they're doing here, Your Honor. They're trying to delay a final rule while they take as long as they like to choose whether or not it might need to change. They haven't found any error or any security concern. They've specifically found there's no security risk. But they've found cause for doubt. To my – to my explanation earlier about agencies, that happens all the time. It happens with judges. You do something and then you have some doubts about it and you want to think about it anew. Their primary reason, Your Honor, and their clear and transparent reason for this is because they already used up the three months the statute allows and they're trying to find another way. They can't do that whether within the bounds of their statutory authority. That's the statutory argument again. Or the arbitrary and capricious test. Because if that were possible, an agency could undo any final rule. There is no stopping point. It's a generic excuse that they might want. I always thought that was the law. If they use notice and comment, they can change the effective date or compliance date of a rule. They could rescind the rule, which they haven't done here. But they could change the effective date or compliance date so long as the new effective date or compliance date is otherwise reasonable under all the facts and circumstances. And here they're saying we're changing the effective date or compliance date. And they give a laundry list of reasons, you know, safety concerns, cost benefit analysis, that there were burdens on state and local, there wasn't coordination with OSHA, there were small business concerns. And those may turn out to be not. But they want to look at that anew. The key there, Your Honor, is it may turn out to be not. And what they have said now is we've found not even a procedural error. We'd like to take additional comment. To the extent there's information people could provide, we'd like to consider it. But there is no new information. We've cited in the record J1093, other locations. They specifically rejected the contention that West and its likely cause undermines any part of the decision the agency made because, in essence, it shows the need for stronger protection. They do say that factors in the record could be assessed differently because of different policy preferences. So they say that. And then on a security risk, for example, why can't they say, look, we're just not willing to tolerate the risk that the forced disclosure of information will enhance the security risk. We want to fix that or look at that more carefully. What's wrong with that? Because bounds of reason decision-making don't allow the agency to act based on speculation. If, in fact, it had evidence, it had any finding before the court. What do you mean by evidence? Because they had a lot of commenters who said this, who said this was going to be a problem. The same comments that they previously considered and rejected. So those commenters did not provide any evidence for their consideration. By contrast, the record of the chemical disaster role shows substantial evidence of the need to put these in place to reduce deaths, injuries, exposures, shelter in place for millions of Americans, but particularly for workers and communities. Just as a big-picture level here, again, assuming they have statutory authority, a new administration comes in and they might evaluate a number of things differently at a big-picture level. One, which level of government should handle something, federal versus state or local? Two, they could have a different perspective on what actually best enhances safety when they look at something. And three, they could have a different evaluation of how to strike the balance between costs and benefits. As Justice Breyer likes to say, no regulation pursues safety at all costs, and they might have a different place to strike it. And that's what, as Chief Judge Garland wrote in Home Builders, that's what elections are waged on, and new administrations may come in and evaluate those things differently. What is, at a big-picture level, and then connecting at this case, what is wrong with them coming in and doing that like the Obama administration did in 2009 on new source review? On an issue I believe that was never reviewed or challenged, but on this issue, Your Honor, they may be able to reach that conclusion based on evidence, but they haven't yet, and they can't delay change in effective date now without meeting the most basic requirements to provide a reasoned explanation based on the record. They have the additional hurdle that they're not acting on a blank slate. EPA carefully considered all this same information, as Doc said. But you can look differently at this. My broader point is you can have the same information and two people can look differently at it and what conclusions to draw about where to strike the balance. And they haven't yet made any such conclusions, and there is no authority under the statute or the statutory decision-making requirements to say, we might want to change this later, we're not sure how. We don't know if any of these are valid. We actually recognize that we found the costs are reasonable compared to benefits. This is a reasonable regulation to save lives, and we actually are not changing any of that. Your approach, though, would force them or a future agency, because this is going to recur with new administrations in future years, would force the agency who's in this agency's position of having doubt, would force them to rescind the regulation rather than to call a timeout through notice and comment rulemaking. And is that really the best way to go, to force them to rescind? Because if you told them they can't do this, they might have just rescinded the thing. And you would have challenged that. We have challenged this as an effective decision. For the 20-month time during this exemption, people have no protection. My question is, your legal approach to this would force an agency in the future, and this agency, but agencies in the future with future administrations, when they come into office, you have two choices. You can either continue on with a regulation that you might think is flawed or at least have doubts about, or you can rescind it. And you can't, by notice and comment, do a 12-month change of the compliance date or something like that. And does that really make sense in terms of good governance? It makes very good sense, Your Honor, no matter who is in charge of EPA, because otherwise they can literally change that date repeatedly, as EPA says it may do again, for no good reason. And whether to rescind and take it off the books, or rescind as they've done here and turn it into a piece of paper that provides no protection at all. For no good reason is, of course, they would dispute that. They would say there are lots of reasons why they did it, and they may have run out of reasons at some point. As this Court has said in Seed, the fact that they might put something new in place in the future is not sufficient reason to suspend it. And that is part of this Court's precedent. State Farm didn't say, oh, they want to change. There are many cases where the Court has recognized, okay, of course EPA or an agency could change its mind, but they have to stay within those bounds of reasoned decision-making or there is no finality for any interested, concerned party. Congress struck that balance in this Act to ensure that even if they were reconsidering, which happens all the time, as this Court is well aware, facilities generally comply. Well, you don't have to accept the premise, do you, that it's either or. For example, to the extent a new administration is concerned about national security and the type of information that can be shared, it could simply amend that provision of the rules or whatever else. And the people in the entities that have petitioned the agency have offered the agency some reason. And even if it's just reconsideration, that agency could decide, well, we agree, or the previous administration didn't. You're not arguing that can't happen. Your Honor, if they did have a good reason. Well, a reason satisfactory to them. Sure, for part of the rule, it is essential to our argument that EPA has not provided a reason basis to rescind, to create that total through this call. In other words, I'm thinking of Congress all the time. New senators are elected, new congressmen are elected. They don't say we disagree with all drug laws. They amend them in part or in whole, and EPA could do that too. Yes, and there have been no even speculations made about the training for workers inside the facilities for whom, you know, it's a life and death situation to have that training. They're also protecting the community. Safer ways to operate investigation. Arkema would have had to have an incident investigation that met the stronger requirements with the deadline. Let's press a little bit with what Judge Kavanaugh's questions raise. Is your position then that a new administration coming in must act immediately? I realize we're a year out here. So entities come to the agency and say, you know, the last administration got it all wrong, and we want you to make a series of changes. And the agency says, you may be right, but this is complicated stuff. You know, we need some time to look at this, and 90 days is unrealistic. And one of the questions I had in my mind was, because it's not only Judge Garland's opinion for this court, it's also Chevron. It recognizes that a new administration comes in, and there may be different ways of looking at information. So when Congress was looking in the 90s at prohibiting delay, that wasn't, or wasn't, what Congress was concerned about. In other words, Congress had passed these laws in the 70s, and EPA had done nothing. So Congress said, all right, we're going to do things. And the 90 amendments came in and said, we're going to designate which are the hazardous pollutants, we're going to give you timetables, et cetera. So the courts have said, yes, the agency has to act, but some of these timetables are, you know, guidelines. That's not the word we use. But at any rate, you can't do something in 90 days, or you can't promulgate all of these rules in a year. So you have a little more time, so long as you show that you are being conscientious in addressing the matter. You're not sitting on your hands, because that's what Congress was concerned about when it amended the Act in 1990. So my question sort of from a global point of view is, all administrations are bound to follow the law that Congress has written. And your argument is, look at the plain text. Here it is. EPA can't avoid that. And I think what our questions are pushing at is this is complicated. A new administration, they're trying to find out where their offices are, you know, who their assistants are going to be, what experts they're going to rely on, and all that can't happen in 90 days. So what authority do they have? And I came up with, well, if they're concerned about national security, they can submit that provision and do it quickly. They have the information, they can make a decision. But a lot of this is more complicated. And I'll give you an example. When this court initially vacated a rule, and then the agency and the states came to us and said, don't vacate, leave it in place, but direct EPA to act quickly. And that's what we did. But it still took the agency, when they were doing matters in expedited matters, I think it was three years, and they came back with a new rule. So I'm trying to understand the real-world situation. I get that Congress was clear, but was Congress really considering this aspect of a new administration having a different worldview about what should happen in this area? I think we have to assume Congress was, and that it had seen in the real world how EPA could take a lot of time. And it issued a very special provision. It enacted a special provision in D7B to say, for Clean Air Act rules, to protect public health. I think we cite from COSTEL, to protect our nation's air, to protect health and safety, and in this instance, to try to end the constant chemical releases, fires, explosions that are happening, and to prevent a future Bhopal in the United States, there's a strong urgency. And that was a great part why the Congress struck the balance to say, we want EPA to take good care when it issues a final rule. And when it does, that rule is going to be final. And we're going to put constraints around the rulemaking process, judicial review, reconsideration. We're going to allow them a window to delay. That's the single three-month authority this court has recognized, even after the 1990 amendments, when so much was in flux in Riley, this court recognized that that provision is meant to tie the agency's hands. If, indeed, there's new information which is not present here, and surely they can take as long as they like to reconsider. No one is challenging their ability to consider again, to decide whether to revise these provisions, but it actually undermines regulatory uncertainty. It undoes the entire framework for them to be able to use reconsideration alone, and the fact that they might or they might not change the rule someday, they're not sure, maybe in 20 months. You agree this is a complicated problem. We do, and that is why EPA has already held two rounds of public comment, eight public hearings consulted across the government with experts, national security expert agencies, as well as OSHA, the Chemical Safety Board. It issued this in part in response to 7412R6, which sets a deadline for EPA to respond to Chemical Safety Board recommendations, and a site for that is J1091, where it says, we found these failures and difficulties, and Congress wanted to make sure that after the EPA initiated the program, they would learn over time from additional protections needed. If they are not allowed to, you know, if an agency can take that careful process and that time and reach final resolution, based on thousands of accidents, deaths, injuries, exposures, and then they can just turn around with a stroke of a pen and say, we might just take the opposite look. We're not really sure, but we might want to. That is not reasoned decision making, and as Judge Wilkinson said, it would turn government into a mere matter of Len and Caprice, whoever is in office, to not require them to follow the most basic parts of the components of this course in the Supreme Court's Arbitrary and Capricious Standard for Review. Not only is it too broad, even under the arguments, speculations that Judge Kavanaugh noted, but it's too long. They've said we want 20 months to take comment. They actually took comment on this delay in a shorter time. If there were an issue they needed to address, they could have done it. They didn't. They've issued many other actions during that time. Meanwhile, these terrible incidents continue that are causing harm. Some of our declarants have experienced multiple incidents personally as a result of EPA's now ongoing delay to update on these protections. I would like to reserve any time I still have for a follow-up. All right. Counsel for intervenors. And which intervenor are you representing? Yes. Good morning. I'm Susan Eckert. I'm here on behalf of the United Steelworkers. And we have a narrow focus but an important focus to look at the fact that EPA now, in their decision-making with the delay rule, is downplaying the harms that are associated with the benefits of the original chemical disaster rule on the steelworkers and their families who are front-line community members. In promulgating this delay rule, EPA has not given weight to the issues that we raise, steelworkers and workers, and instead has been focusing on the regulated industry and are dismissing as speculative the benefits of the chemical disaster rule for workers, first responders, and front-line community members. And we've put in many declarations from steelworkers on these issues. One of the more important ones is steelworker Ben Lilienfeld, who works in the Houston-Galveston area for the steelworkers. And it's important to remember that there are real families here, real workers behind this rule, and community members. Our members are the workers and the first responders inside the facility when these accidents occur. And as our declarations talk about, workers are hurt first and worst when there is one of these accidental chemical releases. And this was highlighted and brought home with the Hurricane Harvey in August of 2017. When that hurricane occurred, our members were working at facilities like ExxonMobil, Shell, and Dow. And due to poor emergency planning, these facilities continued production right up to the end while they knew the hurricanes were coming, and they crashed these units, meaning they had to shut them down so quickly that they did it in an unsafe manner, and there were chemical releases, and our members were locked inside. They had to stay at those facilities. They couldn't communicate with their families while these hurricanes were happening. And the rules, if they had gone into place, I guess I'm already out of time, if the rules had gone into place, they would have already helped our members to deal with these horrible accidents that continue to occur throughout the country at steelworker facilities. Thank you. Thank you. All right. Counsel for Respondents, EPA et al. Good morning. Good morning. May it please the Court. My name is Jonathan Brightville from the Department of Justice. With me at counsel's table is Stephanie Talbert, also from the Department of Justice, and John Averbeck from the Office of General Counsel at the Environmental Protection Agency. The intervening respondents have asked me to clarify in advance that I will be speaking for 14 of respondents allocated 20 minutes, and I will be here to take all comers on pretty much all issues, although Shannon Broom, whose counsel for the Chemical Safety and Advocacy Group, will speak for three minutes and focus on security issues and implementation issues as it relates to the current rules. We'll try to follow that agenda, but don't count on it. Well, the Solicitor General of Louisiana, Elizabeth Morrell, will also address the impacts of these rules on emergency planners and states. So I'd like to start out my discussion by, first of all, clarifying some issues with the record, relating to both EPA's actions and findings when promulgating the original RMP amendments, as well as the delay rule. I think there's been some heated language and some imprecise discussion about what happened, both in the original RMP amendments and then in the context of the delay rule. I then want to discuss the substantive authority under 112R7, which I think has already been pointed out, really does grant the agency a tremendous amount of discretion. And finally, then address the 307D7B arguments, which is a statutory provision that this Court obviously dealt with last summer, and we feel very much that the Clean Air Council, the Pruitt decision is very, perhaps the specific holding doesn't address what happened here, but certainly the reasoning behind it and the analysis of those provisions very much control. So, first of all, I'd like to address the arbitrary and capricious issues. And petitioners claim that, and we heard it again here today, that EPA carefully considered and rejected the same concerns, the safety concerns in the rulemaking record for the RMP amendments. And that is simply not correct. Well, no question that the issue was raised. Is that correct? The issue was raised, absolutely, Your Honor. And not only was it raised, the agency actually acknowledged the issue as a significant one and made specific changes to the RMP amendments, as originally proposed in early of 2016, in order to try to resolve those. So there was a proposed Section 68.205, which dealt with coordination and information exchanges. I mean, you may, the agency may not agree now with the results, but previously the agency addressed the issue, responded in the way it thought was appropriate. That's right. So what was the inaccurate representation to the court? That they, well, so they, the representation was that there was, that they thought that they had totally addressed, that the security issues, that they dismissed them. They didn't dismiss them, Your Honor. They actually acknowledged that the security issues were real issues and they actually made changes in the proposed rules. They deleted an entire section. So do you read that particular provision to say to the owner of a chemical plant, you must turn over the architectural and engineering drawings to your plant, to the local community sheriff and fire chief? I think that that language is very broad, Your Honor, yes. So why wouldn't reasonable people figure out what is the appropriate information that has to be turned over? And if the fire chief says, well, that's not enough, and the chemical company says, well, we're not giving you any more because we're concerned about our security and national security, then they can go to court and litigate that. Well, it's very expensive and difficult to go to court and litigate things. I understand, but what I'm getting at is what kind of detail are you suggesting the rule would have? Let's assume that EPA thinks turning over anything other than your address and website is a threat to national security. Why wouldn't it just amend the rule? Well, it's in the process of a reconsideration, and that's exactly what's now underway, Your Honor, is that in response – In other words, what I'm getting at is this issue was presented to the previous administration. It responded, all right? A new administration comes in and disagrees with that conclusion. So amend the rule and change it. So they're in the process of reconsidering the rule. But as to why the rule should not go into effect that was promulgated before, I'd like to address that, Your Honor. But what I'm trying to understand is you acknowledge repeatedly in your brief that you have general rulemaking authority unless another provision limits it, and you keep referring to reconsideration. And you have this provision on reconsideration that at least Congress said is limited to 90 days. And I'm not clear why the administration just wouldn't move forward and amend this provision. Because the same information – there's no new information because it's just that there's a different way of looking at this information and a different way of weighing the information. And you do think turning over this type of information, in my hypothetical, could implicate national security. So go ahead and put out the notice of proposed rulemaking and let's move forward. Well, I would acknowledge that, Your Honor. But let me address, because you've got two points in there. You've got two issues in there. One relates to the reconsideration, which, by the way, is not a defined term in either the APA. Well, you keep using it. Well, right. It's a term. And that's right. And Congress used it. And Congress used it. However you define it, you have 90 days. No, that's not – I would disagree with that, Your Honor, because reconsideration, the use of that term, is going to depend upon the context in which it's used and deployed. There certainly is a form of mandatory reconsideration that's set forth in 307D7B of the statute that comes about. And it's important because – just stop and pause for a second and think about that statutory provision. 307D7B. Okay, that provision comes late in the 307D1234 progression of how EPA goes about doing rulemaking. And because when you read the entirety of that provision, what you see is a provision that is really ultimately carving out an exception to what is otherwise going to be the record for purposes of review and the objections that the court will consider for a record review on rulemaking that is basically already made. And what that section really goes to and really does is it creates a possibility for people to come forth and prevent or present evidence that they might not have otherwise had an opportunity to of central relevance and say, hey, EPA, wait a minute, wait a minute, wait a minute, here's this final extra thing that we didn't get a chance to do in the notice and comment rulemaking process that we think you should take a look at. And that's where the 307D7B provision then comes in, is it provides an opportunity to get that information in front of the agency and then ultimately in front of the court as part of the review. As part of that, 307D7B then does grant to, and this is the critical distinction, it grants to the agency a unilateral administrative power not to amend the rule, not to modify the rule, but simply to stay the effective date of the rule while it looks at such a thing. The existence of that power and the grant of that power is totally next to and is in no way inconsistent with the EPA then having the authority to do exactly what they did here. Because let me stop you there. Without that provision, how would EPA reconsider something? They would have to do it through notice and comment. Through notice and comment rulemaking, yes. So that provision comes in, I assume, to say to do a 90-day reconsideration, you don't need notice and comment, you can just do a 90-day. That's right. That's right. It grants a unilateral administrative power. The question is, does that displace the preexisting authority to amend a rule, including amending its effective dates by notice and comment? That's the question. That is the question, and that's the argument that they've made. We think that none of the canons of statutory construction that they put forward actually command that that provision displace that statutory authority. Because, first of all, so they bring up the canon of construction that the specific date should control over the general. But that canon of construction is applicable when you have two provisions that are doing the same thing and are reaching supposedly different results, and so you have to give one effect over the other. That's not the case here. It's possible to give effect to both of these provisions, and it's entirely logical to do so. The 307D7B provision is a narrow mandatory reconsideration that comes about at the end of an ongoing rulemaking process. Just so I understand your statutory argument, are you saying then that if someone says to the EPA, I don't have any new evidence, but you're a new administration, and I think that you should just reconsider this rule, that that does not fall within 307B? If someone comes forth with evidence that was previously considered and does not meet the central relevance and other tests that this Court articulated in the Clean Air Council provision, then, yes, you could not invoke 307B7B. You still could go back and, therefore, undertake a notice-and-comment rulemaking procedure to actually affirmatively amend or modify the rule, as EPA did here, but you could not come back and use 307D7B unless the prerequisites for that are met. Why did the administration do the three-month delay for this petition? They did the three-month delay because they felt initially that they had issues that were presented that there was not an opportunity to comment on, and that actually brings me back to a point I was trying to make with Judge Rogers, is that this is not a case where EPA just turned around and said, hey, we're just going to assess things differently now, because actually in the final rule they actually added new language, new provisions, that had not previously been subject to notice-and-comment. They didn't just do that, but that's part of what they did. That's part of what they did, yes. So when they deleted 68205, they added new language to 68.93, new language that the public had never seen, that the regulated community and states had never had a chance to offer comment on. And so after the rule went final, they got new information, because they were getting new information they didn't have previously about this new provision that wasn't in the proposed rule. That's the point, isn't it? This could go on forever, that every month somebody comes with new information, and let's assume it's information that is worthy of the agency's consideration. So this rule never goes into effect? It can't go on forever, not under the Clean Air Act and not under the procedures that are set forth in WS7D. Well, you say in the delay rule, in such other matters as we may wish to consider. All right, that's pretty open-ended. And I think, what do you think of the observation that Judge Silberman made in his separate opinion in Riley, talking about how the language that Congress has given us suggests that there may be this ample margin of safety such that you could have a situation where while you're considering changes through notice and comment rulemaking, nevertheless, what was the final rule goes into effect. In other words, I understand the delay rule that says, stop, we need almost two years and maybe more, because we may get some more new information and we may think of other things that we want to take into account. I mean, there is no end game in there. And to the extent you want to talk about context, look at the 1990 amendments and what Congress was reacting to. So there is an end game in the delay rule. Yes, in such other matters as we may wish to consider. Well, the end game here is that, first of all, the delay rule is actually very limited in scope, and that's one of the additional points that I wanted to clarify. In such other matters as we may wish to consider? And we don't know what those matters might be? In terms of what the reconsideration may be, the reconsideration, undoubtedly, Your Honor, is broader than what the delay rule actually does. And that's another point that I want to make sure I'm very clear about, is that the delay rule actually has a very limited effect. It doesn't actually impact six out of the seven provisions that EPA found in its regulatory impact analysis when it promulgated the original risk management program amendments would have societal benefits. So let me just walk you through that, if I could. So this is the prior administration. This is not the current administration. When it put out the final rule, it had its regulatory impact analysis. That regulatory impact analysis said these new rules were going to have $131 million worth of costs on states, facilities, whoever who are implementing these rules. Now, to offset those costs and to justify the rule, EPA also acknowledged they had no data that allowed them to, given the scope and the nature of these provisions, forecast that there would be any quantifiable benefits whatsoever. But they didn't tell you it would cost $2 or $2 million. But they could say, because there wasn't any data, that these were qualitative improvements. And courts have acknowledged, including this court. And so they did draw them. Yes. And they listed what those provisions were, what those provisions were that would actually provide those qualitative provisions, benefits. They described them in the regulatory impact analysis. My question is, why don't you just amend the rule? They're going through a reconsideration process to do. When are they going to end the reconsideration? Because this says such other matters as we may choose in the next two years to consider. What I can tell you about the reconsideration process is, and this is public information. You can take judicial notice of it. But is that, at this point, a proposed rule has gone to OMB for interagency review. And at this point, they are on a pace that is akin to the pace that they were on when they undertook the risk management program amendments that were finalized and promulgated in January of 2018. Are they on pace for the new rule potentially to be issued when the delay rule runs out? That is my understanding, general understanding. If you kind of work through the amount of time it takes to go through interagency review, take notice and comment, get those comments, respond to those comments, go back to OMB, and then finalize and publish the rule. You were making a point about most of the provisions aren't really affected by the delay rule. And I assume what you were getting at there is the compliance dates for most of them are 2021, and therefore even if at the end of the reconsideration EPA says we're sticking with the original rule, those won't be affected. Those are going into effect. That's right. Well, but you acknowledged, all right, in the delay rule itself and the preamble that you may have to adjust those later dates. And indeed, the prior administration pushed those dates out because the industry said it needed that amount of time in order to comply. Well, and if EPA takes that action, if they adjust those, they're going to have to come back and justify those actions to this court. But that's not the issue, and that's not the rule that's before the court at this time. When did this proposed rule go to OMB? Just approximately. Earlier this week, Your Honor, last night. Exactly. March 12th, Your Honor. Written number 2050 HE95. All right. So, but let me do this. But to Judge Rogers' point, I mean, part of the justification of the delay rule was to have regulatory certainty so that these regulated entities won't have to start the compliance process until they know for sure what the outcome is going to be. So you can't kind of have it both ways and say, well, you know, those dates aren't going to be affected while you have as a justification essentially baked into this that those dates, even if you came out with the same conclusion with respect to the rule, that industry is going to need more lead time to comply. Well, ultimately, the regulations are there, and industry is on notice that absent the completion of a notice and comment rulemaking procedure that amends those or some other administrative action that's within the power of EPA to implement, they're going to have to comply with those dates. Actually, the delay rule tells them don't worry about it. It doesn't say that, Your Honor. I disagree with that characterization. Well, it says such other things as we may wish to consider. Well, it says that, but it also specifically addresses the issue of whether or not there will be other deadlines adjusted, and it disclaims any specific intent to do so. It notes that it may adjust those dates as necessary after conducting its reconsideration proceeding and actually looking at doing another proposed rule, but it doesn't state in there that it will adjust those dates and does not make that representation. Can I ask a question here? During the 90-day period, EPA held a hearing, didn't it? I believe it did, Your Honor, yes. And so in addition to having the three petitions and whatever information was accompanied of those petitions, EPA received information as a result of what I'll call the 90-day reconsideration period. What did it do with that information? I mean, my point is it appeared that EPA was proceeding with the idea that, yes, we have these three petitions, we're going to look at it, we have a hearing, and then we're going to move ahead. Right. And then sort of nothing happened. No. And the delay rule came. Well, no. Actually, the delay rule is what happened. So the information that was gathered – no, because ultimately, right, the delay rule is a regulatory change. It is an amendment to a compliance date in the regulation promulgated after full notice and comment. And so where that information went and how that information was used is that's what was used by EPA to then justify and implement the delay rule. I'm trying to get back to – because we've taken you far away, I realize, but you said you were going to talk about arbitrary and capricious. So you heard counsel this morning, and, of course, you know the record in this case. People are injured. People are dying. These accidents occur regularly. They've occurred since January. So where in the delay rule does EPA address any of the factual findings that under vinyl rule and its determination that it was important to make certain provisions effective immediately and give industry the time it said it needed? Sure. It did it in the response to comments in the delay rule and the joint appendix at 1672 and 1668, and I can talk to you a little bit about that right now. Did it say nobody's being hurt? Well, you have to look again, and I'm trying to get back to you ultimately because it ties together here. No, but you have to focus here with me. We're on arbitrary and capricious. Right. There are findings out there. That's right. That people, and you heard counsel for the United Steelworkers talk about not only their employees, their facilities, the families, the communities. So if you're going to delay this thing, where is the finding that we are satisfied that these harms are not going to occur? So EPA made a finding that given the limited scope of the delay rule, which I'd like to walk through how limited it is and why it is limited so you can understand that. Given the limited scope of the delay rule, there would be minimal, if any, benefits lost as a result of the delay rule. But you heard, I mean, we just heard this morning, again, and the record is full of this problem of these are extremely dangerous situations. People are continuing to be harmed. I don't see anything in the delay rule that says we have evidence that these harms are not occurring. Well, what we need to look at, Your Honor, in terms of justifying the regulatory change that happened, is what is the record that supports the actual change that was implemented? Okay, I'll give you a simple one, all right? The provision that goes in immediately, all right? And you say, or EPA says, we're not worried about that. It's not really going to affect anything. And so the fact that you're bypassing that shouldn't disturb anyone. But it never, so far as I know, and that's why I was hoping you could tell me, it never responds by saying, essentially, we disagree and we have information to support our conclusion. Well, what they agreed with is they agreed with the idea that security concerns are very acute issues that were, first of all, not fully addressed by the original amendment. So, I mean, I don't need to repeat myself, but so amend that part of the rule. But what I'm trying to get at is, you said you were going to tell me why the delay rule is not arbitrary and capricious. And it has a laundry list of reasons, but it doesn't address the danger and the damage to property that's ongoing. And so this is a finding of the agency. But, Your Honor, the point that I'm trying to get to is that is the provision that the delay rule impacts. They're one and the same. There were seven provisions in the delay rule. So, as the state argues, why delay the whole rule? It doesn't delay the whole rule, Your Honor. Because the compliance states are later than most of them, right? All of the compliance states are later. That means you have taken the position that industry must have misrepresented to the previous administration that it needed this additional time in order to comply with the rule. I don't think that our position necessarily requires that, no, Your Honor. Well, that's the reason given for pushing certain deadlines off. Because industry said it needed time for training, for coordination, for the technological changes. So this administration must have concluded either to accept your argument that the delay rule has no impact on these later deadlines, along the lines of Judge Wilkins' question. As a statutory matter, we're here reviewing the rule promulgated pursuant to EPA statutory power under 312.7, or excuse me, 112.7 and 307.d. And the record that we are reviewing is the record on that delay rule. As that record reflects, and as the findings now are, yes, in the past, in the history, it was submitted that this was the amount of time that was required in order to comply with these provisions. Those provisions continue to be in place. And at this point, the industry is also on notice as to what those provisions will be. It is possible that those provisions may be changed in the future. I can't deny that. I won't deny that. It's possible that those provisions will be left alone, and industry will be expected to comply with those provisions now on notice as of January 13, 2017, what those provisions are. If at the end of the delay rule you just stay where you are and continue the current rule as is, to pick up on Judge Rogers' question, I think industry might sue saying, wait, we don't have long enough to comply with the original compliance dates. It's arbitrary and capricious not to extend the compliance dates. The question is, is the prospect of that a reason that we should think about it being arbitrary and capricious now? It would seem to me that's something we can consider then rather than considering now because it's just not effective, those provisions. The compliance dates, the 2021 compliance dates, those are too short at the end of the period, and that can be sorted out in future litigation. I would agree with that, Your Honor. At the point at which there may be a rule that is promulgated in the future by EPA that modifies those compliance dates, EPA is going to have to justify that. Or keeps the compliance dates. Or keeps the compliance dates. You're anticipating Judge Kavanaugh's questions. That's why I asked you about the provision that was to go into effect immediately. Yes, may I talk about that and walk you through that? So the provision, so there were seven provisions in the regulatory impact analysis that EPA attributed societal benefits to. And they were the various compliance deadlines one, two, three years out into the future. Of those seven major provisions, and EPA uses this terminology, it refers to the Meyer provisions and it refers to then these more significant compliance deadlines and provisions which would go into effect one, two, three more years out into the future. Of those, there is only one that has been modified by the delay rule, and it is the provision in 68.93 that relates to coordination between emergency responders and facilities and the like and requires them to do planning on an annualized basis. Now what's important to understand, though, about this provision, 68.93, is first of all, that is the provision that EPA added language to after acknowledging that there were security concerns and so we're going to fix the security concerns by deleting 68.205, but we're going to put a little language in here that will still provide for some information disclosure in 68.93. So this is the very same provision that they finalized without further notice and comment and subsequently now acknowledge, hey, industry has come in and they've made a point that we might have put in place a security loophole that we need to go back and take a look at. So this is the same provision. In terms of substantively what it actually added was it added a requirement not to do planning. That was in the existing rule in 68.95. The existing rule already required coordination and planning between facilities and emergency responders and local entities. What it added was it added an express requirement under the risk management program to do that on an annual basis. However, and this is important to understand, again, the minimal disbenefits that can be contended to come from delaying this provision. However, the existing 68.95, which as I already stated, already required coordination between the facilities and local entities, also had in 68.95C a requirement that that planning be done in conjunction with the planning that goes on under EPCRA, the Emergency Planning and Community Rights to Know Act, which covers the same substances as the risk management program, although it's on certain different thresholds at certain points, but it's the same substances. And it's requiring substantively many of the same things. Here's the real picture, is that ultimately 303 of EPCRA requires that those plans be reviewed on an annual basis. So even under the existing risk management program regulations, you had a requirement to coordinate between local officials and facilities. You had a requirement, you had to do that in conjunction with the planning you're doing on EPCRA, which is substantively very similar. And then EPCRA itself had a provision that said those plans need to be reviewed on an annual basis. And so that is the disbenefit, if you will, that EPA looked at and said next to the security concerns, next to some of these policy concerns, next to these other things, and ultimately this is only being put off by 20 months, which again, for an annual requirement, 20 only divides by 12 once. So that means you were essentially, by this delay rule, putting off one round of required coordination and planning between facilities and local entities that would need to otherwise occur expressly under the risk management program regulations, as opposed to under the risk management program amendments in conjunction with the planning you're doing under EPCRA, which is required to be reviewed on an annual basis. So that's quite a mouthful. Let's suppose the EPA had just done something this simple and said, we're going to move all of the relevant compliance and other deadlines back, the effective dates for those back 10 years, and then we were having this argument. What would be the standard of review that we would use for an arbitrary and capricious argument? Would it be the FOX or would it be something else? I think if you entirely removed compliance requirements and you were left with nothing, at that point then you would fall into the rubric of some of the cases that have been cited to the court. I believe it was a NHTSA case where NHTSA went about changing the tread requirements on tires, and when they went about proposing the reconsideration to come up with a new treadwear pattern, they actually totally did away with the other regulations and left nothing in place. And this court reviewed that and ultimately vacated that decision, in part because you went from something to nothing while you were looking at putting something different in place. That is not this case, Your Honor. I mean, we have gone from something to essentially pretty much the same something. In my hypothetical, would FOX apply? Would Justice Scalia, writing for the court, articulate it as the standard of review when the agency changes course? I think ultimately it comes down to what the record in your hypothetical reflects, Your Honor. I mean, I hate to say that because it sounds like such a dodge. But, I mean, ultimately the standard in FOX is the standard, which is that you have to look at the record that's been compiled and try to determine what's the justification. Would 10 years probably be unreasonable? Isn't that an easy question? I think it probably would be unreasonable, Your Honor. Yes. So I guess to get to the point, why isn't the FOX standard the relevant standard for this case? The FOX standard is the relevant standard for this case, and one of the important things to do is to work all the way through the FOX standard and look at the fact that the FOX standard doesn't necessarily require that you affirmatively walk back or explain away prior findings. To the contrary, the FOX standard comes back to the point that I was just making, which is you've got to really look at what it is that the agency has done and what it hasn't done and what that record is to determine at the end of the day, did the agency look at what it did, and does it have a reasonable basis to believe that it is a better course to undertake these actions, as opposed to the policy that was in place? It doesn't have to say the old policy was bad or wrong. All it has to do is say, do I have a better policy? And that's exactly what this Court quoted in Clean Air Counsel v. Pruitt last year when it addressed this issue of, geez, does 307D7B really foreclose EPA from undertaking anything or not? This Court wrote, we emphasize, however, that nothing in this opinion, this opinion that found that the 307D7B use of the administrative stay had been not proper, nothing in this opinion in any way limits EPA's authority to reconsider the final rule and to proceed with its June 16th NPRM. And a key digression here, the June 16th NPRM that was at issue there was a two-year delay rule, just like the delay rule at issue here, to allow the agency to do a reconsideration and go back and look at the policies again. So you're reading that opinion as approving whatever was in the Notice of Proposed Delay? I'm reading that opinion as not controlling, of course, the holding of this case, so much as I'm citing to this opinion in the hopes that it will reinforce the instincts that I saw on display during the questioning, which is that ultimately there is no inconsistency here, and that the power under 307D7B is a distinct power, a unilateral power, that doesn't in any way underscore or undercut the power ultimately of EPA to utilize its Notice in Common 307D rulemaking authority. That was the instinct, if you will, that the Court establishes in the dicta of this case, and I think that instinct is correct. But isn't that argument undermined by the fact that this rulemaking, by your own admission and what you've even argued this morning, not just based on 112R, but that it is based on 7607D? I mean, you said that this is a reconsideration rulemaking that's under both of those provisions. So reconsideration is not a defined term, and it is a term that takes its meaning from the context in which it is used. And so agencies use all the time the term reconsideration to mean what is, as a technical legal matter, we are going to amend the regulations we already have in place, or we're going to modify those regulations. When you're utilizing your 307D Notice in Common power, that's the kind of, quote, reconsideration that you're undertaking. You're looking at the regulations, they're on the books, and we're going to go back and change them. And that's what the delay rule actually did. It actually went back and changed the regulation, changed the date. 307D7B is not that. It's an administrative form of reconsideration that allows, as I've already described, a little bit more information to come into the record, to go before ultimately the agency to inform its decision, and then to this court. And it is in that kind of separate mandatory reconsideration that this court described it in the Clean Air Council decision last year, that this 90-day limit comes into play. And there's a good reason, ultimately, for a 90-day limit in that specific context. It's because it's unilateral. The agency doesn't have to go out and justify it with notice in common. All it has to do is have someone come forth with information that meets those criteria, and then it can issue that state. It doesn't have to get public comment. It doesn't have to give notice. And it's not ultimately subject to the same fulsome review that a notice in common rulemaking would be subject to. So what's really going on here is they're trying to give this word, reconsideration, some sort of uniform application that is not consistent with the statute. What review would we give? Let's suppose a petition for reconsideration is filed under 7607B, and the EPA grants it and says, you know, we agree that this should be reconsidered, and we're going to delay the effective dates of everything two years, full stop. What review do we give that? When you say full stop, they just announced it, and they didn't actually subject it to notice and comment, or is it? Okay. At that point, I mean, that's already, frankly, controlled by a case that was issued by this court, I think it was in 1983, where EPA essentially implicitly did that. There was a regulation on the books, and EPA kind of announced, we're not going to enforce that regulation, and there was a challenge brought, and EPA's action was vacated because it was found by this court, in effect, that that was a rulemaking by EPA. So Judge Wilkins' hypothetical, that would be unlawful. Yes. Yes. If I may, Your Honor, I'm hugely over time, but I actually really haven't had an opportunity to address the 112R7 issues, either directly or indirectly. Well, we have a couple of minutes, all right? But I think you have to be careful about talking about the court's instincts. This argument is to enable the court to understand the party's position. That's all. Thank you. So on the term practicable, they say that that speaks only to the entity, the regulated entity's ability to meet the deadline. Your response? I think practicable, as Your Honor pointed out during the discussion, is a term that reflects Congress's broad grant of authority to an agency such as EPA to consider a lot of factors. But ultimately, this whole practicable discussion is really a red herring, amos, because the underlying purpose of 112R7 and requirement of R7 is that EPA is to promulgate regulations that actually prevent releases. That's the language of the statute. The administrator is authorized to promulgate release prevention, detection, and correction requirements. And so this court shouldn't even get to the issue of whether or not these regulations are being put into effect expeditiously or not, because the finding now made by EPA in the context of the delay rule is that these regulations and the regulation that was delayed, the one regulation that had substantive impacts that were found in the regulatory impact analysis, 68.93, that regulation may not actually prevent releases. It may, albeit inadvertently, but it may actually encourage releases. And so you don't even get to the question of whether or not this regulation must or has to go into effect. EPA has already found – Suppose we disagree with you on that, then what, on expeditiously? Well, then again, it comes back to an analysis of what is the language within the statutory provision that helps to answer the question of how much discretion EPA has been granted or how much it is limited by the statute. And this is a statute that ultimately talks using the term practicable, which a number of courts have considered and regard as a term that Congress uses when it wants to afford a significant amount of discretion to agencies to make these judgments. Practicable itself is in Black's Law Dictionary, which is one of my favorites for this purpose to go to, and talks about practicable as something that's reasonably capable of being accomplished, feasible. But there's also other language that's – We understand what the word means, but why use in this sentence, in this context, should practicable refer to what is practicable for the agency versus the regulated parties? So I know those words appeared in their brief, but that isn't exactly what EPA did, because a substantial consideration of what it did was also to consider the minimal disbenefits that would occur as a result of the rule, which in effect goes to what requirements were already in effect and present at these facilities that would justify either having a longer or shorter time period. And the statute, again, to come back to the language of the statute, it says that EPA is empowered to consider, quote, factors, and this is when promulgating the regulations, including. So Congress uses the word including, but not limited to, which again is language that Congress uses to grant broad discretion to an agency. The size, location, process, process controls, quantity of substances handled, potency of substances, and response capabilities present at any stationary source. So these factors easily encompass EPA's consideration of the minimal, if any, benefits lost by way of the process controls, response capabilities that were already in place at these facilities when trying to justify and determine the appropriate length of time by which this regulation, this 68.93, which it was also determining may actually encourage releases, not prevent them, should go into effect. What do you think the phrase as determined by the administrator adds to practicable, if anything? I think as determined by the administrator is another phrase, a turn of art, that Congress uses to grant discretion to the administrator, obviously. All right. Thank you. So if there are no more questions, I'd just like to make one final observation, which is that- That you haven't already made. That I have not already made. All right. And it is this, that the holding that this court would establish by denying the petition here would necessarily be one that would be very narrow. It would merely be that when EPA learns, after the promulgation of a final rule, that that rule, as finally promulgated, may do more harm than good. It has the power to offend or extend, excuse me, the effective date of certain provisions to go back and take another look at that, to be sure, based on its notice and comment rulemaking. I think you have made this point. All right. Thank you, counsel. Thank you, Your Honor. We'll hear an intervener for the Chemical Safety Advocacy Group. Good morning. Good morning, Your Honors, and may it please the Court. I am Shannon Broome, and I am speaking today on behalf of the Intervener for Respondent, the Chemical Safety Advocacy Group. I will note that we are also a petitioner in the litigation on the underlying 12-year-old 2017 RMP amendments, which the delay rule is delaying the effectiveness of. So, petitioners argue that public safety will be compromised if the delay rule stands, and this is simply untrue, and, in fact, the opposite is the case. I have three points in support, but given the discussion so far, I'll just mention briefly that the existing rules are protective, but the most important thing is that the delay rule is actually delaying dangerous provisions of the 2017 RMP amendments, and Judge Rogers, you spoke earlier about danger, and I just want to highlight exactly what Mr. Breitfeld was mentioning briefly, which is that. Can I ask you, is it your position that EPA has made that determination? Made the determination that. Letting these provisions go into effect will be dangerous. EPA has said substantial concerns have been raised in that regard. But it has not made a determination, has it? EPA. I'm just asking. I haven't found it. If they have made it. They have not. They have said that they're going to undertake a rulemaking to evaluate that, and that's the reconsideration process. I will say that 68.93 added in what felt like a bit of a switcheroo, but I can understand why they may have made this mistake. It requires companies to disclose to local response organizations, a term that is undefined, information that they identify as relevant to emergency response planning. You heard my question. What's your response to that? The chemical industry owner says, I'm not going to give you, fire chief, what you're asking for, because I think that would endanger national security. The fire chief says, well, I need it. So the chemical company owner says, sue me. So the predicate of your question is that it's the fire chief asking that question. But what EPA has identified is that local emergency planning commissions could ask for that information as well. Could ask. Could ask. They could ask. I'm mandated to turn it over. But the rule works. If I'm a company, and I'm a lawyer for a company, and they come to me and they say the press, who is a member of the local emergency planning commission, has asked for this information. So the press, the public, a volunteer firefighter, a volunteer community member is on the LEPC. They ask for this information. They say it's relevant to planning. Well, EPA, and they say, EPA listed in the response to comments at JA 1008 that one of the things that people are encouraged to request are the field exercise evaluation reports. Those show the strengths and the weaknesses of the field exercises that have occurred for responding to emergencies. And they contain vital information for criminals who could target facilities and the steel workers who live next to the facilities and me, myself, who sees the Chevron refinery out the window of my house. So I am concerned, as a citizen and as a lawyer, that these provisions would allow this information to get out. And once it is out, it is out. It is on the Internet. So even if we accept your point, why is that justification for delaying all of the deadlines for the entire rule? EPA did not delay all the deadlines for the entire rule. Or any deadlines beyond having to pertain to that provision. That's the only provision that is affected by the delay rule is 68.93 in terms of it's a coordination provision. And I would say also... That's because of the compliance dates again, right? Exactly. And we actually commented on a proposed rule and asked for broader relief, and EPA said no. And so now we'll have to comment, and that will be the regular process. And if we're unhappy, we'll challenge. And if somebody else is unhappy, they can challenge. And they said, you have to prepare. And so my clients have to prepare. That's where they are. And if they don't, they'll have to certify noncompliance. And to your earlier point, Judge Rogers, it was a good question. Companies have integrity policies. They are not allowed to violate the law willfully. That's a known violation. I wasn't suggesting that in my hypothetical either. If the Coordination Committee wants my national security plans and I refuse to turn them over, do you think I'm violating the law? Under this provision, you would be. And you'd have to certify noncompliance in your Title V permit. And then that would expose you to a citizen suit under Section 304. I thought the rule was carefully worded. They can request it. All right? At any rate, I get your point. And I gather these were the considerations that were raised. And you would like further restrictions placed on the disclosure requirements. Exactly. I mean, that's a big concern that we had is that there was no procedure for protecting. And under the, for example, the Pipeline and Hazardous Materials Safety Act, there are strict provisions for restricting access and certain things like the pipeline maps. To even go online and see the pipeline maps, you have to have certain security clearances. None of those procedures were considered. And basically EPA took everything that was in the public disclosure provision and put it in the LEPC disclosure provision without understanding, because they didn't go out for notice and comment on it, that the public is on the LEPC. So it's out. There's no remedy to that. And I would submit to the court that EPA acted not only not arbitrarily and capriciously, but did the only thing it possibly could do when this information came to its attention as a responsible agency. And I would like to just respond briefly to, I believe, counsel for petitioner misspoke when she said that the Arkham incident would have been required to be investigated if these rules had gone into effect, not even taking into account the compliance states. The process and the chemical that was at issue at Arkham was not an RMP-covered chemical. So it is not subject to these rules. And the same is true for the Bruce Mansfield incident they cite in their brief. It is not an RMP facility. And then there was another one in there that is not RMP-covered. So from your perspective, do you want further regulation? I think my clients have never said that the rules could not be improved. That doesn't mean that what EPA did is not dangerous and shouldn't be reconsidered and that a pause is not appropriate. It is appropriate here. It's a pause. So could I ask that during the 90-day period when EPA conducted the hearing, did your organization submit comments along this line to EPA? Yes. Thank you. I've did many others. Thank you. Thank you for your attention. Counsel or intervener, the State of Louisiana. Thank you, Your Honor. Please record. I'm Liz Merlin. I'm the Solicitor General for the State of Louisiana, and I represent a 12-state coalition that are also petitioners for reconsideration of the amended rules. Judge Rodgers, I think I want to speak initially to the point, the question that you asked about why not just say no and litigate. And the answer to that question is because that takes time. And from a very practical standpoint, all states are the primary responders and the coordinators of response for emergency planning and responding to accidents as they occur. And we do that in a very coordinated way, that in a system that was created after 9-11 and that's been refined now over the years through multiple accidents. There's additional federal congressional acts of Congress that take lessons learned from Hurricane Katrina, from Hurricane Sandy. I mean, to the point that we even now have an act of Congress that talks about pets, how to deal with pets, because people won't leave if you can't move their pets. So emergency response has dramatically changed since 9-11. And this rule, I mean, we raised these questions, and I think this goes to the point that the other interveners raised about whether or not EPA considered and addressed these concerns. They did acknowledge that we raised legitimate concerns about both security and coordination. The problem is they didn't really fix them. They fixed them with a final rule that made the problem worse. And so what happens is they've created a situation where there's confusion, and confusion is the enemy of effective response. It always is. Confusion breeds chaos. It wastes time. And when you have chaos, confusion, and wasted time, you lose lives. And that's a fundamental aspect of emergency response. And so I think it's very, very important. We view that 20-month delay as a pause that gives some critical time. It is not arbitrary and capricious where we had no opportunity to provide notice, where there was no notice and no opportunity to comment on the change that was made. It's a limited delay. During the 90-day period and the hearing, did you submit these comments to EPA? We did submit the comments to EPA, and we have expressed our concerns about both the coordination provisions being now more vague. We don't know who they are supposed to coordinate with because lowercase emergency response officials means multiple organizations now. There's no alignment, and there's still no alignment in these rules, even in the final rule with them. Just a practical consideration. Suppose EPA goes through a rulemaking and decides to leave these provisions in place, much to your concern. What happens next? Well, I think we will take every opportunity we can to continue to try and provide notice and to provide comment. Of course. No, no, no. I'm taking it a step further. Suppose EPA hears your concerns and decides to leave in place this coordination provision. I'm assuming then the 12 states get together and figure out how we're going to implement this. Well, we would work, as we always are and as we continue to do, to coordinate on all hazards planning.  It will continue to occur. It will occur, I hope, and would like to see EPA act in less of a vacuum in the context of the National Incident Command System and management, which would integrate EPA and EPRA and this entire emergency response planning. I'd like to see that more integrated with NIMS. And I think that even DHS raised those concerns and would like to see more. And time gives us some time to do that. I mean, there's no question that the status quo, it's not arbitrary and capricious even for 20 months to allow some time to keep the status quo. I guess what I'm raising is you represent a 12-state coalition. That coalition has had to meet on numerous issues and resolve matters that either are unclear or may be inadvisable. And so this is an ongoing process. And I hear sort of two lines here. One, we want EPA to do more, but we want it to do it differently. And two, we can do it ourselves. EPA is unnecessary here. We have all these. We have OSHA. We have the state laws. We have the county laws. We have municipal laws. So sort of get out of our way and let us resolve these matters. But then I hear, no, no, no, we want EPA to step in. And I would just comment, you know, Congress has acted to protect animals, but years ago it acted to protect human beings and the environment, and it hasn't changed that law. And, Your Honor, the states don't take the position that there's not some value in improving these rules. I mean, I think that that's – I don't think anybody actually disagrees that it's a good idea to improve and modernize the rules. But the devil's in the details, and I think there's nowhere that that is more true in a situation of emergency response, and I think you can see the evidence of that in multiple acts of Congress, that every time there's an event, we have to adapt to the lessons that we learn from that event. The BP oil spill was a great example of that, and Louisiana was the point of the sphere for that event. And it was a great example of a situation where we had a different emergency management response system that was led by the Coast Guard, and we had glitches and delays in the process because nobody had really drilled for that yet. And so the more we integrate the process, the more we talk and make sure that there is actual meaningful coordination with our federal agencies, with state agencies, and with the whole – that's the whole concept of national incident management, is that we have integrated coordination and control and that we have a uniform system of even vocabulary. And if you look at the rules, you will see and you look at and you compare that to FEMA rules and regs, you will see that they don't even use the same vocabulary, and that alone can create a problem. So I think that what I want to emphasize is how important it is in a context of emergency planning and response that coordination is really the critical linchpin of this process. And we do have ongoing coordination, but when you layer confusion and change that may again change and create more confusion, you are inhibiting the ultimate goal of this process, and that is to improve emergency planning and response. And so we share the goal of improving. We obviously share the goal of wanting to save lives. We don't think that the delay will cause more lives to be in jeopardy. In fact, that the delay could – that not delaying the rule could, in fact, jeopardize more lives because it injects that element of confusion and chaos and delay which can make the difference between a life saved and a life lost. Thank you. Thank you, Your Honors. All right. Council for the State Petitioners, I'll give you a couple of minutes here. Thank you. I just want to make three quick points. The first is a point of clarification. The emergency coordination provisions are not the only immediate provisions that are delayed by this delay rule. Another important step to have an immediate compliance date were improvements to accident investigation practices the facilities were meant to undergo. This meant things like investigating near misses, not just actual releases. I'm using trained personnel to conduct investigations and producing reports within 12 months of the accident. And EPA specifically found in implementing these requirements in the amendments that they were important so that facilities would have lessons learned from these accidents in time to prevent the next one from taking place, and those are delayed under this rule as well. Secondly, our statutory argument here is not in general – Actually, on the first point, one of the big arguments that's been made is that without the delay rule, that provision is going to actually harm safety, not help safety, and that the other provisions, major provisions, compliance dates are far out in the future and really are not affected, at least at this time are not affected. And that's why you raised these other provisions in your first point on rebuttal, which was a good point. But what about that, that the main provision that is being delayed is a provision that, in the judgment of EPA and others, like the state of Louisiana and the states, would, if allowed to stay in place, actually harm safety, not help safety? Well, a couple of answers to that. One is that EPA did not make actual specific findings that there would be harms that are caused by this process. What they said was that petitioners have raised various concerns about harms that we intend to consider in this 20-month process. The other is that there were no specific findings about, for instance, accident investigations that I can recall being particularly dangerous. And even as to coordination, the objection there was to the sharing of certain information. There are also requirements about, for instance – What about the sharing? I mean, that alone is a problem, right? That is correct. I mean, it is a problem that EPA did address before, made changes to the rules to address it, and that put in protections to ensure that whatever safety concerns or national security concerns that might be, could be worked out in the process. There's still a problem, so says a number of commenters, and I don't know the merits of that, but I just know that that's been raised. That's been raised, and EPA itself doesn't know whether that is an actual national security problem and is one of the core parts of this argument. We heard from Mrs. Eckert that – no, excuse me, from Mrs. Boone, that on behalf of the chemical safety advocacy group, some changes were made that allow access that is clearly – my words, not hers – clearly inappropriate, and there was not time to comment on those before the final rule was promulgated. Right. We disagree with that position. I mean, there were concerns raised about a broader set of information sharing provisions that EPA specifically responded to, made adjustments directly in response, and to fix those problems, and then deemed those responses to be adequate to balance the national security and safety concerns with the important need for information. As I think my friend from Louisiana emphasized, coordination information sharing is important. Every state agrees with that. We are often local responders. Our individuals are on the front lines of these accidents, and we need that information to know what problems these first responders will face when they enter into these facilities. It's often unique and uniquely dangerous. Do you think what she just said is wrong about the harm that the rule left in place? We do. We do. I mean, the information sharing requirements in the amendments were meant to address a very serious deficiency, which is that very basic requirements, such as the nature of the chemicals on these sites, were often not being shared with local responders, meaning that people were going into these facilities blind. They didn't know, for instance, that a fire was being started by the chemical. That is nothing like a wood fire. It requires different equipment, different safety protocols to follow. And as a result, they were both being injured by these accidents and also unable to effectively deal with the types of releases that were taking place here. As I understood, part of her argument, though, was that in applying certain standards, it made information, sensitive information, accessible by the public, which was totally inappropriate. I believe the public information provisions have been radically scaled down from the original proposal here, and really the state petitioners here are primarily interested in the information sharing with local responders, which would not by themselves be public information. But the second point I wanted to raise was on our statutory authority argument, which is that our argument is not a general attack on the agency's power to amend its rules or even its effectiveness. It's instead a recognition that Congress focused on a particular type of delay here, which is delay pending agency reconsideration, and recognize that even when that reconsideration raised issues that, under the terms of the statute, are of central importance to the outcome of the rule, that there was only a very limited delay that was permitted under 307D7B. And there's no indication in the text or the history of that provision that Congress cared about the process by which that delay came about.  Both the intervenors for the chemical safety advocacy group and the intervenors from the state of Louisiana and the 11 other states said during the 90-day period, as I understood their response, these points were made to the agency. Was your earlier comment that that would have justified EPA setting up a rulemaking proceeding and going forward? Because at one point, and I wanted to clarify this, and maybe I misunderstood what you said, there would be no delay, no statutory limit on the time EPA would have to address those matters. I hope this is answering your question. Let me be clear. What I want to understand is you have the 90-day period. It's a public hearing. These concerns are presented. Then what? Does the agency have to act on them within 90 days? The agency does not have to act on them within 90 days. Well, suppose it thinks they're worthy of doing something. Right. Well, I'll say there's two things. One is there's no requirement the agency act on them within 90 days. They can take as long as they want to come up with the rule. What they cannot do is, on the basis of the concerns that are raised, to then delay the effectiveness of a final rule. But the second is the agency is not required to either rescind the rule or keep the entire thing in place. There are many things the agency could do in response to specific objections, including tailoring any changes to either substantive provisions or the effective dates, based on actual factual findings where the agency's expertise is brought to bear. Doesn't that take time to do that? I mean, take time to think about how to do that? When you come in, a new administration comes in, this is a morass, and you're trying to figure out, okay, this provision, that provision. You're dealing with all the stakeholders. It takes time. It absolutely takes time. That's what a 90-day period is there for. And, again, Congress ---- 90 days. I mean, you know this, but 90 days is not much time to do the kind of process that would be a good process for something as complicated as this, with all the people affected around the country. But two things. One, it may not be enough time, but Congress understood the reconsideration issues that would be raised in the 90-day period, including issues of central importance to the rule. I'm repeating myself now, but I want to say it again, which is the 90-day thing you can do without notice and comment. Before this provision ever came into place, the agency could always do notice and comment to change the effective date or compliance date of a regulation. So your argument, I think, has to be when 307 came in, it displaces that prior existing general authority. Well, that's correct. And what Congress was focused on was the outcome. They didn't want rules to be delayed, you know, pending the outcome of a reconsideration proceeding. And we know that Congress was focused on that outcome because they also said judges couldn't delay the effectiveness of the rule based upon a reconsideration. So it was not a concern about the process. That didn't displace the APA, correct? It didn't, but it did say that ---- If it didn't displace the APA, why shouldn't the same be here? It didn't displace the prior agency authority to do notice and comment. It did displace it in this narrow sense, which is for both judges and for the agency, whatever other sources of authority they may have, they cannot rely upon the pendency of a reconsideration, including important issues raised there, as a basis for delay. That's the narrow statutory argument that we're making based upon 307. But even then, the agency can, as long as it makes factual findings outside of the mere pendency of a reconsideration, rely on its broader authority to change the rule, change the effective date, change the substantive standards. And there's no reason, and we haven't heard any specific finding from EPA, that, for instance, altering the information sharing requirements here in an actual substantive amendment required the two-year period. There's no specific finding on that. So walk me through this, Counsel, so I'm clear. Now, EPA, during the 90-day period, holds this hearing. The substantive concerns are expressed. And let's just assume that EPA agreed that it was a mistake to allow the community panels to have access to certain information. Now what can EPA do? If they had a concern about that specific problem, there's nothing barring them from relying on their 112 authority to amend that part of the rule. And as part of that, to also change the effective date since the substantive standards have changed. So let me be clear. All right, so EPA decides we want to make an amendment, but it says, you know, maybe we want to look more carefully and see what's happened. I'm just trying to get the sequence of timing here because I hear you saying that, of course, EPA can proceed by the regular notice and comment rulemaking. But normally that happens after the agency has done some studies, received reports, et cetera. I understand your point about there's a lot of data in the record. So it's only a matter of new data that would justify this process, presumably. Right. Or EPA could simply announce in a notice of proposed rulemaking, we have these three petitions and there are certain concerns we have. We want to hear from the public on them within 60 days. They could do that as well if these concerns are extremely serious and the agency is willing to actually stand behind a finding that they are serious, which they have not done here. They could proceed by emergency rulemaking if they satisfy the good cause standard as well. I mean, the agency is not hobbled from doing what an agency is supposed to do, which is to make findings based on record evidence that there are concrete problems that they are trying to address and then taking the steps under the Administrative Procedure Act to address them. But what they may not do is what Congress prohibited, which is to simply say, we think there might be problems. People have raised problems that we may consider, and on the basis of that put off a rule that was supposed to have concrete and immediate benefits to the public. Thank you. Thank you very much. All right, counsel for community petitions. Thank you. I'm going to try to make three quick points, Your Honor. On the statute, the argument on the respondent's side is equivalent to allowing the mere filing of a reconsideration petition to stall the finality of a final rule, which is exactly why Congress repeatedly wrote the language it did into 7607D and B1. It said that shall not be used as a delay tactic, and that language must be given effect because it is at the core of the framework for judicial review and rulemaking. That is the only set of statutory constraints on EPA's authority. Barring that, as this discussion has shown, arbitrary and capricious review is meant to be an important final check. But those statutory constraints are critical to ensure an agency, whoever is in office, acts within its delegated power. The practicability question, I wanted to just highlight on that point that, in connection with the statutory argument under 7412R7, EPA did carefully consider the practicability for sources to comply. So this is one of the many examples where EPA is attempting to sidestep, dismiss, or downplay prior findings directly contrary to FOX, even though they contradict its own findings. And an example is the definition of practicability. EPA promulgated 68.3, which defines practicability for sources. There is no discussion that it's meant to be relevant to anyone other than the owner or operator. Very briefly, there are so many record sites that I'd love to offer for the Court in response to these arguments, but there is no evidence in this record that these immediate provisions are minor. In reality, the real-world impact with Arkema, with the Eastman explosion that Connie Tuohy faced, with the Valero refinery fire, even a near-miss at Arkema, the very purpose of part of these amendments was to ensure that a near-miss of that nature would be investigated. It would have a knowledgeable person on the team. There would be a one-year deadline for a report, which could be immediately used, and the response to comments from the first rule is replete with sites regarding how important it is to investigate that. So it's completely incorrect to say that it wouldn't have applied to strengthen protections for that community during the delay, including for the next hurricane season, which is scheduled to begin June 1st. That's just one of many examples, but the emergency response point is so directly contradictory to what EPA found repeatedly. Many sources are not subject to comparable requirements. Enhancing emergency response is necessary because they're often not included in the AFPRA community plan. JA1000, J999, necessary, important, useful, better coordination will mitigate the impacts of accidental release to the surrounding community. We're hearing about the importance of coordination and the need for more coordination. It's hard to see how a situation could be more confusing and more harmful than what we saw at Arkema, where first responders arrived on the scene and became sick because they did not have the information they needed. The Chemical Safety Board, other data in the record, very strongly supports EPA's original findings. So even if the court considers EPA's attempt to downplay them now as significant, it has not engaged with that evidence. Regarding it very briefly, there's no question that EPA did not just delay one measure. In addition to the examples I highlighted, the training, emergency response, the whole purpose and effect of this was to enable and ensure noncompliance. And that's an important part of this record and this case. It is, in some ways, a unique... Wait, can you, on that, the whole purpose and effect of this is to ensure noncompliance? Was to enable... Enable noncompliance. And make very clear... That seems like an overbroad statement. Compliance dates are not affected. At the end of the delay period, they could just say, we're not changing anything in those compliance dates with the data set. We don't know anything about that yet. As in EPA's statements in the record, that might be true, Your Honor. But EPA said repeatedly, the purpose of this is to relieve them of that responsibility so that they need not comply. During the, yes, during the period of the delay rule, I'm talking about the, they're still potentially going to have to meet that ultimate compliance date. I see what you are now referring to, though, so I get that. But regarding the compliance dates that are slightly later, there's significant evidence in the record that that time is necessary. Right. You think they won't be able to meet it. The opportunity is equivalent to delaying those. It has a domino effect. Okay. I understand that. And it also removes protections that would have started incrementally to occur during the delay. So there's additional harm as a result, even after that 2019 date has arrived, that we are trying to prevent and reduce through this effort. You know, in some, the community petitioners respectfully request that this court vacate the delay rule, ensure that, no, EPA's own, EPA does not get the benefit of its illegal action by allowing this argument that has no, literally no stopping point, to allow it to delay life-saving protections that people needed yesterday, last year. If we vacate the delay rule, we would go right in, presumably, into litigation from the other direction, challenging the underlying rule. Correct. I mean, that doesn't defeat your claim. I'm just trying to figure out the real world here. We'd go for one, everyone would switch sides, and we'd be on litigation about the prior rule. That's correct, Your Honor. There's the process to the agency. There's the process for the court. The real-world effect is people would immediately have stronger emergency response before June 1st, when the next hurricane starts in the Gulf. So the immediate real-world effect is they would get the benefit of the protections that EPA found were necessary, based on quite a robust record. And we are very glad to continue to participate in that other litigation, and we are interveners there as well. But what we are here to focus on is the harm from EPA's unlawful, irrational delay, and we respectfully request vacature. Thank you. All right, we will take the matter into consideration.
judges: Rogers, Kavanaugh, Wilkins